IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 2, 2020

### IN RE TREYMARION S. ET AL.

**Appeal from the Juvenile Court for Henry County**
**No. 40JC1-2018-JT6          Vicki S. Snyder, Judge**

_____

### No. W2019-01330-COA-R3-PT

_____

In this matter involving the termination of a mother's parental rights to her two minor children, who were eight and seven years of age, respectively, at the time of trial, the trial court determined that there were three statutory grounds supporting termination: (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of the conditions leading to the Children's removal. The trial court further found clear and convincing evidence that termination of the mother's parental rights was in the children's best interest. The mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

Anthony L. Clark, Paris, Tennessee, for the appellant, Latonya P.

Herbert H. Slatery, III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### I. Factual and Procedural Background

On July 25, 2016, DCS filed a petition in the Henry County Juvenile Court ("trial court"), alleging that the two minor children ("the Children") of Latonya P. ("Mother") were dependent and neglected. DCS stated that when the Children's father took the

Children for co-parenting time, he discovered bruises and abrasions on the Children's backs, legs, and buttocks. Upon report of these injuries, DCS sent an investigator to interview the Children, who both reported that Mother had hit them with a "backscratcher" and punched them in their stomachs. In the petition, DCS requested that the Children be placed in the temporary custody of the father's godparents.

On July 29, 2016, DCS filed an amended petition, asking the trial court to place the Children in the custody of DCS. The trial court entered a protective custody order that same day, determining that an immediate threat to the Children's welfare existed and that no less drastic alternative to removal existed. The trial court subsequently entered orders appointing a guardian *ad litem* for the Children and appointing counsel for Mother.

On August 25, 2016, DCS prepared a permanency plan for the Children, which was ratified by the trial court on October 26, 2016. This plan provided that Mother would, *inter alia*, undergo a mental health assessment and follow all recommendations, pass random drug screens, complete parenting classes, participate in visitation with the Children while demonstrating appropriate parenting skills during visits, provide releases so that DCS could communicate with Mother's health care providers, and maintain safe and appropriate housing for a period of at least six months. Mother also signed the document entitled, "Criteria and Procedures for Termination of Parental Rights," on August 31, 2016, acknowledging her understanding that failure to comply with the permanency plan requirements could ultimately result in DCS's seeking termination of her parental rights to the Children.

On February 8, 2017, DCS prepared a second permanency plan for the Children. Mother's responsibilities under this plan remained largely the same with the additional requirement that Mother participate in anger management counseling. Mother again signed the "Criteria and Procedures for Termination of Parental Rights" on February 8, 2017. The plan was ratified by the trial court on April 26, 2017. A third permanency plan was developed on May 6, 2017. Although Mother signed the plan and the "Criteria and Procedures for Termination of Parental Rights" on the same date, the record does not indicate whether this plan was ratified by the trial court.

On June 6, 2017, the trial court entered an adjudicatory order, determining the Children to be dependent and neglected as to Mother. The court noted in the order that Mother had stipulated that the Children were dependent and neglected while in her care due to lack of supervision and improper discipline. The court further noted that the Children would remain in the temporary custody of DCS and in their existing placement with their foster parents.

DCS prepared another permanency plan on August 14, 2017. Mother's enumerated responsibilities were similar to previous plans with the exception of (1) a notation that Mother had completed parenting classes and (2) a change in the requirement

that Mother would maintain stable housing for three months rather than six. The trial court ratified this plan on October 25, 2017, and Mother signed the "Criteria and Procedures for Termination of Parental Rights" on that same date.

A fifth permanency plan was developed on February 6, 2018. In addition to the responsibilities assigned to Mother in prior plans, DCS added a requirement that Mother would remain engaged during visits with the Children rather than falling asleep or becoming preoccupied with her telephone. This plan also noted that Mother had been informed on several occasions that she needed to obtain new housing and could not continue to live with family members against whom safety allegations had been made. The trial court ratified the plan on April 25, 2018.

A sixth permanency plan was prepared by DCS on September 13, 2018, with the sole listed goal of adoption. In this plan, it was noted that Mother had failed to listen to direction from the therapeutic visitation workers during her visits with the Children and had failed to interact with the Children appropriately. Mother was directed to refrain from bringing cellular telephones to future visits. Mother again signed the "Criteria and Procedures for Termination of Parental Rights," and the trial court ratified the permanency plan on October 24, 2018.

Meanwhile, on October 3, 2018, DCS filed a petition seeking to terminate the parental rights of Mother as well as the Children's father, who is not participating in this appeal. In the petition, DCS relied on the following statutory grounds in support of termination of Mother's parental rights: (1) abandonment through failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of the conditions leading to the Children's removal. On October 16, 2018, DCS and the guardian *ad litem* filed a joint motion seeking to terminate Mother's visitation with the Children, alleging that the visits caused the Children to become aggressive and exhibit negative behavior.

On October 23, 2018, Mother filed a motion seeking return of the Children to her custody. Mother stated that she had obtained housing on August 24, 2018, had completed parenting classes and anger management counseling, and had passed random drug screens upon request. Mother also claimed that the Children's behavior had improved during recent visits.

The trial court conducted a hearing concerning the pending motions on December 12, 2018. In its resultant order entered February 6, 2019, the trial court stated that the parties had announced an agreement concerning the pending motions. Based on the parties' agreement, the court ordered that Mother would continue to have supervised visitation with the Children but that such visits would occur separately with each child. The parties further agreed that Mother's motion seeking return of custody would be heard in conjunction with the termination hearing.

The trial court conducted a bench trial with regard to termination of Mother's parental rights on May 24, 2019. Numerous witnesses testified, including Mother, the father, the DCS family service workers, employees of Youth Villages who had provided therapeutic visitation services to Mother, and the Children's counselor. The court subsequently entered a written order on June 26, 2019, terminating Mother's parental rights. Based on the proof presented, the court determined that clear and convincing evidence supported the statutory grounds of (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of the conditions leading to the Children's removal. The court further found clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. The court certified its order as final pursuant to Tennessee Rule of Civil Procedure 54.02. Mother timely appealed.

## II. Issues Presented

Mother presents the following issues for review, which we have restated slightly:

1.    Whether the trial court erred by allowing a counselor, Francine Owens, to testify as an expert.

2.    Whether the trial court erred by determining that DCS had proven, by clear and convincing evidence, the statutory ground of abandonment by failure to provide a suitable home.

3.    Whether the trial court erred by determining that DCS had proven, by clear and convincing evidence, the statutory ground of substantial noncompliance with the permanency plans.

4.    Whether the trial court erred by determining that DCS had proven, by clear and convincing evidence, the statutory ground of persistence of the conditions leading to removal.

5.    Whether the trial court erred by determining that DCS had proven, by clear and convincing evidence, that termination of Mother's parental rights was in the Children's best interest.

DCS presents the following additional issue for our review, which we have also restated slightly:

6.    Whether Mother waived the issue regarding the trial court's decision to allow Francine Owens to testify as an expert.

- 4 -

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or

substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In addition, as our Supreme Court has explained, this Court is required "to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 525.

## IV. Testimony of Francine Owens

Mother presents as an issue whether the trial court erred by allowing counselor Francine Owens to testify as an expert witness. DCS argues that Mother has waived this issue, however, because the argument section of Mother's appellate brief contains no argument in support of this issue. Generally, "when a party raises an issue in its brief, but fails to address it in the argument section of the brief, we consider the issue to be waived." *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Mabry*, 402 S.W.3d 654, 661 (Tenn. Ct. App. 2012) (quoting *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002)).

As our Supreme Court has explained:

It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.

- 6 -

*Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010). Insofar as Mother failed to develop an argument in support of this issue in her appellate brief, we determine that it has been waived.

## V. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2020) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)    Termination of parental or guardianship rights must be based upon:

(1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)    That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Mother's parental rights: (1) abandonment through failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of the conditions leading to the Children's removal from Mother's custody. We will address each statutory ground in turn.

### A. Abandonment by Failure to Provide a Suitable Home

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides, as relevant to this action:

(g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

- 7 -

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) (Supp. 2020) provides:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

With regard to this statutory ground, the trial court specifically found:

The record is clear that parenting is the primary concern related to these children and has been since they were placed in DCS custody. The lack of residential stability is the next important concern for these children, and the physical structure of the home is not the only factor to consider when evaluating residential stability and a suitable home. There has been no improvement from either parent, and they have not even been able to

receive unsupervised visits with their children after 34 months of the children being in DCS custody. [Mother] is residing in essentially the same situation and with the same people as she was when the children were removed. The father remains in a position where he cannot care for the children. Neither parent has completed mental health services.

The children have been in the custody of [DCS] for approximately 34 months and during that time the parents have made little to no efforts to change the conditions in their lives or homes to enable . . . the children to return to their home despite reasonable efforts from [DCS] to assist them to do so.

* * *

Based on the facts set forth above and pursuant to T.C.A. § 36-1-113(g)(1), the Court concludes and finds that grounds for Termination of Parental Rights do exist as to [Mother], by clear and convincing evidence, based on abandonment by the parent or guardian for failure to provide a suitable home for the child as defined by T.C.A. § 36-1-102. The children were removed from the home of [Mother] and were found to be dependent and neglected by the [trial court]. The children were placed in the custody of [DCS], and [DCS] made reasonable efforts to assist [Mother] in making her home suitable for the children; however, she failed to make any reasonable efforts to provide a suitable home for the children at an early date, and at the time of trial had not established a suitable home for the children as is more fully explained above.

Based upon our review of the evidence presented in light of the statutory factors, we agree with the trial court.

Mother has not disputed that the Children were adjudicated dependent and neglected by the trial court on June 6, 2017. In fact, Mother stipulated to the dependency and neglect finding based on lack of supervision and improper discipline. Mother also has not disputed that the Children's situation prevented DCS from making reasonable efforts prior to removal.

Mother does dispute, however, whether DCS made reasonable efforts to assist her in establishing a suitable home for the four months following the Children's removal. Marty Weed, the original DCS family service worker assigned to the Children, testified during trial that the Children were brought into custody due to physical abuse and environmental neglect. Mr. Weed opined that the Children were underweight at the time they were brought into DCS custody, and he related that the eldest child had a birth defect affecting the use of his hand, for which he had not been receiving therapy or treatment. Mr. Weed stated that the Children exhibited a great deal of aggression,

resulting in a recommendation that Mother receive a mental health evaluation in order to determine her level of stability. Mr. Weed testified that although he had attempted to assist Mother in obtaining a mental health evaluation, such evaluation did not occur during the time he was assigned to the case.

Mr. Weed further testified that despite a recommendation that Mother and the Children participate in family counseling, Mother refused to do so, even via telephone. Mr. Weed reported that Mother was living in a small, two-bedroom home with her mother, her sister, and her sister's three children at the time of the Children's removal, resulting in the Children's sharing a bed and bedroom with Mother. Mr. Weed stated that due to Mother's unsuitable housing, he provided Mother with listings for other available housing but that Mother failed to follow up on the leads provided.

Mr. Weed testified that he met with the parents early on and explained their responsibilities under the initial August 2016 permanency plan. Those responsibilities included undergoing a mental health assessment and following recommendations resulting therefrom, establishing residential stability, and participating in therapeutic supervised visitation to build parenting skills. Mr. Weed stated that although he transported Mother to such visitation, Mother did not fully participate in the provided visitation because she was paying attention to her cellular telephone rather than the Children.

Angela Henson, another employee of DCS and Mr. Weed's supervisor, testified that she was also involved in the matter from the time the Children came into custody and for nine to ten months thereafter. Ms. Henson stated that she participated in developing the permanency plans as well as the supervised visitation between Mother and the Children. According to Ms. Henson, Mother was supposed to be attending counseling but reported that she had stopped going in October 2016 because she wanted to switch counselors. Mother provided no further information to Ms. Henson concerning mental health counseling, and DCS had no record of Mother undergoing a mental health assessment. Ms. Henson stated that although Mr. Weed and she repeatedly offered Mother transportation to assist her and specifically offered to transport Mother to different apartment and housing complexes to help her apply for housing, Mother refused their offers. Ms. Henson stated that Mother's housing situation needed to change because the Children did not have their own room and had reported witnessing sexual acts in Mother's home.[1]

As this Court has previously explained concerning the reasonable efforts analysis:

---

[1] The Children's father also testified that the Children had reported watching Mother and her paramour "doing things" in the bedroom and being allowed to view pornographic materials.

> Reasonable efforts is a fact intensive inquiry and must be examined on a case-by-case basis. *State v. Puryear*, 2005 WL 735038, *9 (Tenn. Ct. App. Mar. 30, 2005). "Reasonable efforts" as defined by the legislature is "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tennessee Code Annotated section 37-1-166(g)(1) (2003). However, the burden of family reunification does not lie entirely with DCS as reunification is a "two-way street." *State Dept. of Children's Services v. Belder*, 2004 WL 1553561, *9 (Tenn. Ct. App. July 9, 2004).

*In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005). Having reviewed the evidence presented during the trial of this matter, we agree with the trial court's determination that DCS made reasonable efforts to assist Mother in establishing a suitable home in the four months following removal.

DCS provided transportation and services to allow Mother to participate in supervised therapeutic visitation with the Children. DCS offered transportation for other services, such as assistance in locating new housing, but Mother refused those offers. Mother failed to follow up on information provided by Mr. Weed concerning housing opportunities and obtaining a mental health assessment. Mother also voluntarily ceased attending individual counseling during the first four months the Children were in DCS custody, and she refused to participate in family counseling, even telephonically.

As this Court has explained, "[t]o be considered reasonable, [DCS's] efforts need not be 'Herculean,' but they must be equal to or greater than those of the parent." *In re Brian W.*, No. M2020-00172-COA-R3-PT, 2020 WL 6390132, at *5 (Tenn. Ct. App. Oct. 30, 2020) (citing Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). We conclude that DCS's efforts in this case greatly exceeded Mother's efforts and were reasonable. In addition, despite DCS's efforts, Mother had not "made reciprocal reasonable efforts to provide a suitable home and ha[d] demonstrated a lack of concern for the child[ren] to such a degree that it appears unlikely that [she] will be able to provide a suitable home for the child at an early date." *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

The evidence demonstrated that Mother failed to change her housing situation for more than two years after the Children were removed into DCS custody. Although Mother had secured different housing by the time of trial, there was little evidence presented concerning the home's physical condition. We note, however, that "[i]n order to establish a suitable home, a parent or guardian must provide more than an appropriate physical structure." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *4 (Tenn. Ct. App. June 21, 2017).

The evidence clearly and convincingly demonstrated that Mother was not able to establish a home to which the Children could safely return due to her lack of parenting skills and inattentiveness to the Children's needs. Although Mother did attend therapeutic supervised visitation with the Children, Mother did not always actively participate or implement parenting skills during the visitation she was provided. Despite DCS's concerns regarding Mother's mental stability, Mother did not provide documentation concerning a mental health assessment or continued counseling. Most importantly, Mother never progressed to the point of having unsupervised visitation with the Children, much less to the point of providing a suitable home wherein the Children would not be subjected to further neglect or abuse if they were returned to Mother's custody. We therefore conclude that the trial court properly determined that clear and convincing evidence supported the statutory ground of abandonment by failure to provide a suitable home.

### B. Substantial Noncompliance with Permanency Plans

The trial court also found by clear and convincing evidence that Mother had failed to substantially comply with the statement of responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

(2)    There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

The court stated the following specific findings of fact regarding this statutory ground as to Mother:

The responsibilities set forth in the permanency plans devised for the children were reasonably related to remedying the conditions which necessitated foster care. Neither [Mother] nor [the father] demonstrated compliance with a single desired outcome or goal on the permanency plans. They each were aware of what was expected of them, and the goals have been essentially the same the entire time the children were in DCS custody. . . . There is no record that [Mother] has complied with mental health counseling; she has not been able to demonstrat[e] appropriate parenting skills through visitation; and she cannot engage fully with the children during a 3 hour visit.

Following our review of the record, we agree with the trial court's findings.

To terminate parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

> Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [643,] 548 [(Tenn. Ct. App. 2004)]. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:
>
>> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.
>
> *In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *20-21 (Tenn. Ct. App. Oct. 21, 2015).

In this matter, the trial court removed the Children from Mother's custody in July 2016. The Children were subsequently adjudicated dependent and neglected on June 6, 2017, based upon Mother's stipulation to the allegations contained in the petition for protective custody. The trial court ratified the first permanency plan on August 25, 2016, which required Mother to complete, *inter alia*, the following requirements: (1) obtain a mental health assessment and follow all recommendations, (2) undergo and pass random drug screens, (3) complete parenting classes, (4) participate in visitation with the

- 13 -

Children and exhibit appropriate parenting skills during visits, (5) provide releases so that DCS could communicate with Mother's health care providers, and (6) maintain safe and appropriate housing for a period of at least six months. Despite the development of five additional permanency plans during the time the Children were in custody, Mother's responsibilities remained largely the same with the addition of a requirement that she complete anger management counseling.

Although Mother did complete parenting classes and anger management counseling, Mother provided no proof of a mental health assessment or continued individual counseling. Mother testified that she had attended individual therapy sessions for some time but changed counselors in October 2016, choosing to continue with Carey Counseling months later. Mother admitted that she had ceased attendance when she felt she did not need further counseling and that she did not consult with her counselor regarding that decision.

Furthermore, although Mother did participate in supervised visitation with the Children, the record demonstrates that Mother did not always actively participate and that she failed to demonstrate appropriate parenting skills during those visits. Mr. Weed, the initial family services worker, testified that Mother often "played" on her cellular telephone during visits rather than paying attention to the Children. Mr. Weed also reported that Mother did not administer appropriate discipline when the Children exhibited negative behaviors and instead relied on the foster parents to do so.

Most importantly, according to several witnesses, Mother never progressed sufficiently to allow her to have unsupervised visitation with the Children, much less to allow the Children to be placed in Mother's custody. Ms. Henson testified that although Mother did complete some tasks on the permanency plans, she failed to take the steps necessary to be awarded unsupervised visitation. Patrese Woods and Deborah Hicks, employees of Youth Villages who provided therapeutic visitation services for Mother, testified that they would not recommend that Mother receive unsupervised visitation with the Children due to her inability to demonstrate appropriate parenting skills during visits.

Ms. Woods related that she had been forced to intervene during visits when the Children became physically or verbally aggressive because Mother was unable to control the situation. Ms. Woods opined that Mother had difficulty handling both Children at once. Ms. Woods further stated that Mother had not appeared for visits consistently and had been reprimanded for speaking to the Children about adult topics. Ms. Hicks likewise stated that she had been required to intervene during visits because the Children would become defiant, aggressive, and destructive. Ms. Hicks related that Mother spent a great deal of time on her telephone and that the Children also played with it or fought over it, such that Mother had been instructed that she could no longer bring the telephone to visits. Ms. Hicks also opined that Mother was unable to control the Children and had not demonstrated the parenting skills to do so.

- 14 -

Tessa Rickman, the current DCS family service worker assigned to the Children, testified that Mother had not demonstrated stability in her parenting skills during visitation. Ms. Rickman also opined that Mother had not made significant progress with her parenting skills despite services provided by DCS and Youth Villages. According to Ms. Rickman, although Mother had a bond with the Children, that bond was more akin to that of a friend or peer than a parent-child relationship. Ms. Rickman therefore stated that she would not recommend unsupervised visitation with Mother either currently or in the foreseeable future.

Ms. Rickman opined that the Children needed structure, clear rules and expectations, constant supervision, and a caretaker with very strong parenting skills. Ms. Rickman stated that Mother had been unable to demonstrate the ability to appropriately parent the Children. According to Ms. Rickman, even after Mother's receipt of services for over two years, she remained unable to keep the Children safe in one room for two to three hours.

Mother admitted at trial that she was unable to keep the Children under control during visits, stating that one of the Children had become destructive during a visit and had threatened to kill her and his brother. Mother acknowledged that she had, on occasion, asked the foster parents to discipline the Children during a visit because "they listen to them more than they listen to [Mother]." Mother admitted using a backscratcher to "whip" the Children in the past.

In addition, Mother failed to remedy her inappropriate housing situation for over two years from the time the Children were taken into DCS custody. Although Mother had obtained a new apartment by the time of trial, she was still allowing her mother to stay with her much of the time and was living next door to her sister. In addition, Mother was living with her boyfriend, who was unfamiliar to the Children and DCS.

Based on the evidence presented, we conclude that Mother had failed to substantially comply with the goals and responsibilities of the permanency plans. Mother did not establish a suitable home and did not demonstrate that she could appropriately parent the Children despite almost three years of assistance from DCS. In short, Mother had failed to "complete [her] responsibilities in a manner that demonstrate[d] that [she was] willing and able to resume caring for [the Children] in the long-term." *See In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). We therefore determine that clear and convincing evidence supported this ground for termination as well.

### C. Persistence of Conditions Leading to Removal

The trial court also found clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Children from Mother's home or physical and legal custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (Supp. 2020) provides:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B)    The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In the case at bar, the Children were removed from Mother's custody in July 2016 and were adjudicated dependent and neglected on June 6, 2017. As previously explained, although Mother was provided services by DCS for almost three years by the time of trial, she had still failed to establish a suitable home or exhibit appropriate parenting skills during supervised visitation. Due to Mother's inability to properly care for the Children, Mother was never recommended to receive unsupervised visitation, much less return of the Children to her custody. We therefore conclude that the conditions leading to removal still persisted at the time of trial.

Based on the length of time that the Children had been in DCS custody, we further conclude that there was little likelihood that these conditions would be remedied at an early date so that the Children could be safely returned to Mother. Mother was

characterized as somewhat uncooperative with DCS's efforts to assist her, refusing offers of transportation and family counseling and failing to follow up on housing opportunities and recommendations for a mental health evaluation. Moreover, it is clear that continuation of the parent-child relationship would inhibit the Children's ability to integrate into a stable home. Several witnesses testified that the Children's aggression and acting out increased following visits with Mother. For all of the foregoing reasons, we conclude that clear and convincing evidence supported this statutory ground for termination.

## VI. Best Interest of the Children

Mother contends that DCS did not present sufficient evidence to support the trial court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the Children. We disagree. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

- 17 -

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In

re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Mother's parental rights to the Children after reviewing each factor in turn and making specific factual findings. Based upon our thorough review of the record presented, we agree with the trial court's conclusion.

Regarding the first factor, whether Mother has made such an adjustment of her "circumstance, conduct, or conditions" as to make it safe and in the Children's best

interest to be in her home, we determine that this factor weighs against Mother's maintaining her parental rights because she failed to demonstrate, following nearly three years of DCS assistance, that she was able to appropriately parent the Children during limited, supervised visitation. Although Mother had changed the circumstance of her physical home, she had not demonstrated the mental stability or parenting ability to render it safe for the Children to be returned to her custody. Concerning the second factor, and again despite the many months of services provided by DCS, Mother had failed to effect a lasting change in circumstance. Inasmuch as the Children had been in custody for almost three years by the time of trial, such lasting adjustment does not reasonably appear possible. Ergo, the first two factors weigh in favor of terminating Mother's parental rights.

Factor three concerns whether Mother has maintained regular visitation with the Children, and we conclude that she has done so. We also conclude that based on the proof, Mother has a meaningful bond with the Children (factor four). As such, these two factors do not militate in favor of termination.

With regard to factor five, however, the evidence suggests that removing the Children from their current placements and placing them, together, in Mother's custody would have a detrimental effect on their emotional, mental, and physical well-being. The Children had to be placed in separate foster homes due to inappropriate sexual behavior and physical aggression between them. It was further shown that Mother could not control their negative behaviors during visitation and that she did not seem to have an understanding of their needs and issues. Moreover, the Children's acting out escalated following contact with Mother.

Factor six involves whether Mother had shown "brutality, physical, sexual, emotional or psychological abuse, or neglect" toward the Children. The evidence demonstrated that the Children were brought into custody because of bruises and abrasions on their bodies, which they claimed were the result of Mother's having whipped them with a backscratcher. Mother admitted to this action, although she denied that any injuries resulted. DCS also presented evidence that the Children suffered physical and medical neglect and possibly sexual abuse when they were in Mother's home.

Little evidence was presented with regard to Mother's current physical home in accordance with factor seven, except that it was somewhat newly established and was being shared with the maternal grandmother and a paramour who had no relationship with the Children. However, no evidence was presented of criminal activity or drug or alcohol use in the home. Factor eight addresses Mother's mental and emotional stability. The only evidence presented concerning this factor was that Mother had failed to complete a mental health assessment and had ceased individual counseling. However, Mother's seemingly cavalier attitude regarding the urgency of the Children's situation

and her permanency plan requirements indicates that she lacked the ability to appreciate the Children's needs or to appropriately meet those needs. Finally, with regard to factor nine, Mother was relieved of her responsibility to pay child support because she received disability payments.

Based on the above-listed factors and the evidence presented at trial, we conclude that the trial court correctly determined that clear and convincing evidence supported its finding that termination of Mother's parental rights was in the Children's best interest. We therefore affirm the trial court's judgment in this regard.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Mother's parental rights to the Children. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Latonya P.

s/ Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE